**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Michael Pengchung Lee,<br><br>Defendant. | No. CR-23-01694-001-TUC-RM (MAA)<br><br>**ORDER** |

Pending before the Court is Defendant Michael Pengchung Lee's Appeal from Magistrate Determination of Detention and Dangerousness (Docs. 20, 29), in which Defendant appeals Magistrate Judge Michael A. Ambri's detention order (Doc. 10). The detention order finds that Defendant, who is currently in custody, poses both a flight risk and a danger to the community. (*Id.*) The Government opposes Defendant's release. (Docs. 25, 31.)[1] Having conducted a de novo review of the record, the Court will affirm the detention order.

. . . .

. . . .

. . . .

. . . .

---

[1] On November 13, 2023, Defendant filed an Appeal from Magistrate Determination of Detention and Dangerousness (Doc. 20), to which the Government responded (Doc. 25). On November 30, 2023, this Court held a hearing in which it granted Defendant's oral motion to file an appeal brief, and granted leave for the Government to file a response. (Doc. 28.) Defendant then filed a Memorandum in Support of Appeal of Detention and Dangerousness Finding (Doc. 29), and the Government responded (Doc. 31).

**I.     Factual and Procedural Background**

   **A. Offense Conduct and Indictment**

Defendant is charged in the Indictment with a violation of 18 U.S.C. § 875(c), Interstate Threats.  (Doc. 14.)  The Complaint (Doc 1) sets forth the following allegations.[2] On October 22, 2023, Defendant sent multiple Snapchat messages to a group chat threatening to commit a mass shooting at the University of Arizona.  (Doc. 1 at 1; Doc. 27 at 12-14.)  During the conversation, Defendant stated, "There's going to be a mass tragedy and atrocity at the UofA Soon."  (Doc. 1 at 1; Doc. 27 at 12-13.)   Defendant's messages referenced the "Day of Retribution" and indicated that he would be targeting "Chads" and "Stacies."  (Doc. 1 at 1; Doc. 27 at 13.)  Agents believe the Day of Retribution is a reference to a mass shooting committed by Elliot Rodger, who targeted a sorority at the University of California, Santa Barbara.  (Doc. 1 at 1; Doc. 27 at 13.)  Rodger was a self-proclaimed "involuntary celibate" or "incel," and this ideology was a motivating factor in Rodger's actions.  (Doc. 1 at 1; Doc. 27 at 13.)  In the incel community, the terms "Chads" and "Stacies" refer to men and women who are sexually active.  (Doc. 1 at 1; Doc. 27 at 13-14.)  Agents suspect Defendant also uses the terms to mean fraternity and sorority members at the University of Arizona.  (Doc. 1 at 1.)  At the time of the Complaint, Defendant identified himself as a former incel on his social media accounts.  (Doc. 1 at 1; Doc. 27 at 15-16.)

Utilizing the University of Arizona Police license plate reader, agents determined that Defendant's vehicle was seen around Greek Row from 9:00 p.m. to 1:00 a.m. on October 11, 12, 13, 14, 17, 18, 19, 20, and 21, 2023.  (Doc. 1 at 2; Doc. 27 at 19, 37.)  In a Post-*Miranda* interview on October 23, 2023, Defendant admitted to authoring the threats and being aware that the threats were wrong.[3]  (Doc. 1 at 2; Doc. 27 at 15.)  Defendant

---

[2] At the detention hearing, Government witness Federal Bureau of Investigation Special Agent Dan Douglass testified to the allegations in the Complaint.  (Doc. 27.)
[3] At the detention hearing, Agent Douglass testified that the phone number Snapchat provided for the account that sent the threatening messages was attributed to Defendant. (Doc. 27 at 15.)  On October 23, 2023, Defendant was pulled over for speeding and thereafter contacted by the University of Arizona Police Department and the Federal Bureau of Investigation.  (Doc. 27 at 15; Doc. 25 at 2.)

suggested, however, that he was venting frustration over his homelife, and he identified himself as a former member of the incel community. (Doc. 1 at 2; Doc. 27 at 15-16.) Defendant stated that he had attempted to purchase a firearm two months previously but had decided against it. (Doc. 1 at 2.) After Defendant's arrest in this matter, agents learned that Defendant was arrested in September 2023 and later indicted for controlled substances offenses. (Doc. 1 at 2; Doc. 27 at 16-17.)

### B. Pretrial Services Report and Detention Hearing

On October 26, 2023, Pretrial Services filed a Report detailing the following significant findings. (Doc. 7.) As to Defendant's mental health, the Report reflects that Defendant has been diagnosed with Asperger's Syndrome, bipolar disorder, depression, and anxiety, but he refuses to take medication or engage in counseling.[4] (*Id.* at 3.) Regarding Defendant's criminal history, the Report finds that the Tucson Police Department arrested Defendant on controlled substances charges in September 2023. (*Id.* at 5.) The Report expresses concern that Defendant possessed a firearm when he was arrested in that offense, but that Defendant later denied to Pretrial Services that he owned any guns. (*Id.*) Additionally, Defendant has two Failure to Appear convictions, a Disorderly Conduct (fighting) conviction, and another Failure to Appear charge. (*Id.* at 4.) The Report further finds that Defendant has a history of substance use, conflicting employment history, and family ties to China. (*Id.* at 5.) Notably, Defendant was in the process of obtaining a visa to travel to China before his arrest in this case. (*Id.* at 2.) Based on these circumstances and the nature of the alleged instant offense, Pretrial Services recommended Defendant be detained pending trial as a risk of nonappearance and a danger to the community. (*Id.* at 5.)

On October 30, 2023, Judge Ambri held a detention hearing wherein the parties addressed the information in the Complaint and the Pretrial Services Report. (Docs. 10, 27.) Government witness, Federal Bureau of Investigation Special Agent Dan Douglass, also testified. (Docs. 10, 27.). In addition to testifying to the allegations contained in the

---

[4] Defendant reported that he is now amenable to receiving treatment, should the Court offer it. (Doc. 7 at 3.)

Complaint, Special Agent Douglass testified that he has since learned that when executing Defendant's arrest on the controlled substances charges, agents observed Defendant watching body camera footage of a mass shooting on YouTube. (Doc. 27 at 17.) Agent Douglass has also learned that agents in that case discovered that Defendant's devices had significant search history for "numerous mass shootings," sorority and fraternity housing, prominent members of a sorority, U.S. passport status, and escape. (*Id.*)

At the hearing's conclusion, Judge Ambri found that Defendant is a risk of nonappearance based on Defendant's research of flight and escape in connection with the alleged crime, prior failures to appear, history of noncompliance with mental health treatment, the lack of a suitable residence, and the seriousness of the allegations. (Doc. 27 at 48-49; Doc. 10.) Judge Ambri further found that "the government has proven by clear and convincing evidence that the defendant is a danger to the community, based on the nature of the alleged offense, nature of the threats, internet searches, the testimony presented, mental health issues, substance abuse issues and criminal record." (Doc. 10.) Accordingly, Judge Ambri concluded that the Government had established that "no condition or combination of conditions will reasonably assure the safety of persons and the community under the circumstances" and ordered Defendant detained pending trial. (Doc. 27 at 48-49; Doc. 10.)

Defendant now appeals Judge Ambri's detention order.

**II.     Legal Standard**

A district court reviews a magistrate judge's pretrial detention order de novo. *United States v. Koenig*, 912 F.2d 1190 (9th Cir. 1990). A defendant will be detained pending trial where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In making an individual determination, courts consider the available information concerning: (1) the nature and circumstances of the offense, including whether the offense is a crime of violence; (2) the weight of the evidence; (3) the history and characteristics of the person, including character, mental

condition, family and community ties, employment, past conduct, history relating to drug or alcohol abuse, criminal history, record concerning appearance at court proceedings, and whether, at the time of the current arrest, the person was on a form of release for another offense; and (4) the nature and seriousness of the danger to the community that would be posed by the person's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). "On a motion for pretrial detention, the Government bears the burden of showing by a preponderance of the evidence that the defendant poses a flight risk, and by clear and convincing evidence that the defendant poses a danger to the community." *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).

### III. Discussion

Defendant advances four main arguments in support of his appeal of the Magistrate Judge's detention order. (Docs. 20, 29.) First, Defendant avers that although he is alleged to have possessed a gun during his September arrest, Defendant "never used it to hurt anyone," he "does not currently own a gun," and it is "doubtful" he can obtain one now given his pending charges. (Doc. 29 at 7-8; Doc. 20 at 3-4.) Second, Defendant concedes that he "made Snapchat and texting threats to shoot up the University of Arizona." (Doc. 29 at 1.) However, he claims the threats were not concrete as he "took zero steps to accomplish anything of the sort," and he was "just venting." (Doc. 29 at 1, 7; Doc. 20 at 3-4.) Third, Defendant claims he has "now distanced himself from extreme positions and antisocial behavior and beliefs." (Doc. 20 at 3.) Finally, Defendant avers that his parents are suitable custodians, the Court can order him to stay away from the University of Arizona, and treatment can address his substance abuse. (*Id.* at 5.) According to Defendant, these conditions would assure the public's safety, and Defendant should, therefore, be released.[5] (*Id.* at 4-5.)

---

[5] Defendant avers that the Government presented three factual inaccuracies to Magistrate Judge Ambri. (Doc. 29 at 2-4.) First, Defendant states that, contrary to Agent Douglass' claim during the detention hearing, Defendant's stepfather is not a co-defendant in Defendant's state-court drug case. (*Id.* at 3.) In response, the Government asserts this inaccuracy was an unintentional misunderstanding and requests that the information be corrected. (Doc. 31 at 8-9.) Accordingly, the Court notes that Defendant's stepfather is not a co-defendant in Defendant's state-court case. Second, Defendant contends that he was not "stalking fraternities" when his car was spotted near the University of Arizona's

The Government opposes Defendant's release and proffers new information to refute contentions made by Defendant. (Docs. 25, 31.) The Government states that since the detention hearing, Snapchat has provided additional messages Defendant sent in group chats separate from the group where the charged threats occurred. (Doc. 25 at 5-8; Doc. 31 at 2-5.) These messages reveal that on the days leading up to and on October 22, 2023—the same date of the charged offense—Defendant was telling group members that he was "gonna er," and that "[t]here's gonna be a mass tragedy and atrocity at the u of a soon." (Doc. 25-2 at 3-5[6]; Doc. 25 at 7-8.) Defendant was also expressing his desire to "er"[7] "chads" (Doc. 25-2 at 19, 24, 28, 34-35), possibly have sexual contact with a minor (*id.* at 31-33), and kidnap and gang rape "coeds" and "Stacies" (*id.* at 22-23, 25, 28). (Doc. 25 at 6.) In an earlier message, in September 2023, Defendant wrote that he was "gonna er," and he elaborated that he was "gonna do it at the police station!!! Suicide by cop!!" (Doc. 31-1 at 43-44; Doc. 31 at 4.) Defendant also indicated that the firearm recovered relating to his September arrest was indeed his, and he still possesses it. (Doc. 31-1 at 46; Doc. 31 at 4.)

The Government argues that these and other messages rebut Defendant's contentions that he was "just venting," that he is no longer a member of the involuntary

---

Greek Row. (Doc. 29 at 3.) Instead, he was working for Uber. (*Id.*) In response, the Government states that while it considered this behavior concerning in context, it did not accuse Defendant of stalking fraternities. (Doc. 31 at 9.) The Court finds the Government's analysis reasonable. Finally, Defendant takes issue with the characterization that Defendant has "mental health issues," claiming that "[t]he only time [Defendant] has ever seen a therapist or mental health provider was when he was 11 years old and his mother took him to therapy because he was playing video games too much." (Doc. 29 at 4.) In response, the Government contends that it is reasonable to infer under the circumstances that Defendant is mentally disturbed. (Doc. 31 at 9-10.) The Court notes that Defendant's claim contradicts the Pretrial Services Report, which states, in part, that Defendant "advised he was diagnosed with depression about five years ago. He was prescribed an unknown mood stabilizer, but he only took it for a few months as he did not like how it made him feel." (Doc. 7 at 3.) The Report goes on to detail that Defendant advised that he was hospitalized for one week at an inpatient facility at age 14, and that he has been diagnosed with several mental disorders. (*Id.*)

[6] In Docs. 25-1 and 25-2, the messages are listed by earliest date and time last, as provided by Snapchat. Therefore, newer messages appear higher on the page. The dates and times are also listed on the chats for reference.

[7] "ER" or "ERing" is a reference to committing a mass shooting. The initials "ER" stand for Elliot Rodger, a mass shooter and self-proclaimed incel. (Doc. 25 at 5; Doc. 25-1; Doc. 25-2.)

celibate community, and that he has now distanced himself from extreme beliefs and antisocial behaviors. (Doc. 25 at 5, 8; Doc. 31 at 3, 5.) To the contrary, the Government asserts that the "[e]vidence now shows that days before the offense, the defendant was discussing rape, kidnap, and murder, all while utilizing incel language and justifying such heinous crimes through incel ideology." (Doc. 31 at 5.) Even without these new threats, the Government contends that the 18 U.S.C. § 3142(g) factors do not favor Defendant's release. (Doc. 31 at 5-10.) Finally, the Government points out that, per the relevant Ninth Circuit jury instruction, "[t]he government need not prove that the defendant intended to carry out the threat." Ninth Circuit Jury Instruction 8.13 Transmitting a Communication Containing a Threat to Kidnap or Injure (18 U.S.C. § 875(c)). Thus, the Government argues that Defendant's argument that the threats were not concrete is unavailing.

Having conducted a de novo review of the record, the Court makes the following findings regarding the § 3142(g) factors. As an initial matter, the Court finds that the Government has established that its newly proffered evidence was not known at the time of the initial hearing, and that the new evidence is material to conditions regarding flight and dangerousness to warrant reopening of the detention hearing. 18 U.S.C. § 3142(f). As to the nature and circumstances of the offense, the Court emphasizes that the charged offense—the interstate threat to commit a mass shooting—is a crime of violence. *See* 18 U.S.C. § 3156(a)(4) ("the term 'crime of violence' means—(A) an offense that has as an element of the offense the use, attempted use, or *threatened* use of physical force against the person or property of another") (emphasis added). The Court further finds that the nature and circumstances of Defendant's threats are egregious. Thus, the first § 3156(a)(4) factor weighs against Defendant's release.

Given that Defendant admitted to making the charged threats, and Snapchat's confirmation that the threats came from an account associated with Defendant's phone number, the Court finds the weight of the evidence, the second § 3156(a)(4) factor, weighs against Defendant's release.

As to the third factor—the history and characteristics of the person—the Court must take into account Defendant's September arrest on controlled substance charges, that Defendant possessed a gun purchased from an unlicensed dealer at that time, that agents observed him watching footage of a mass shooting during that arrest, and that his search history reflected searches for "numerous mass shootings," sorority and fraternity housing, and means to escape. The Court also weighs Defendant's two prior Failure to Appear convictions and Failure to Appear charge, his family ties to China, and that Defendant was in the process of obtaining a visa to travel to China before his arrest. Regarding employment, it is unclear if Defendant is still employed at Chick-fil-A or as an Uber driver. However, employment does not appear to be an effective deterrent for Defendant because this arrest and Defendant's controlled substances arrest occurred while Defendant was employed. Moreover, the Court is concerned about Defendant driving for Uber given his threats to use his position to kidnap, rape, and murder passengers. (*See* Doc. 25-2 at 23.) Considering these circumstances, along with Defendant's involuntary celibate ideology, the Court finds that the third factor weighs heavily against Defendant's release.

Finally, the Court finds that the nature and seriousness of the danger to any person or the community that Defendant's release would pose weighs against Defendant's release. In multiple group chats and on numerous occasions, Defendant expressed his intent to commit mass shootings and perpetrate sexual violence at various locations, including an educational institution and a police station. Defendant has a proven ability to obtain a firearm from an unlicensed dealer, and he committed this offense and the controlled substance offense while living with his mother, casting doubt on her suitability as a third-party custodian. Furthermore, Defendant's recent messages, including on the days leading up to his arrest in the instant offense, undermine Defendant's contention that he no longer subscribes to extremist views or the involuntary celibate ideology. Thus, the Court finds that the fourth § 3156(a)(4) factor militates against release.

Based on the foregoing, the Court finds that the Government has met its burden in showing that Defendant poses a flight risk and a danger to the community. Having

conducted a de novo review of the record, the Court further finds that there is no condition or combination of conditions that will reasonably assure Defendant's future appearance at court proceedings or the community's safety. Accordingly, the Court orders Defendant detained.

**IT IS ORDERED** that Defendant Michael Pengchung Lee's Appeal from Magistrate Determination of Detention and Dangerousness (Docs. 20, 29) is **denied**. Magistrate Judge Michael A. Ambri's Order of Detention (Doc 10) is **affirmed**. Defendant Michael Pengchung Lee shall be **detained** pending trial.

Dated this 19th day of January, 2024.

Honorable Rosemary Márquez
United States District Judge